THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL A. PETERSON, Defendant-Appellant.

Fifth District    No. 5—01—0932

Opinion filed January 21, 2003.

Daniel M. Kirwan and Paige Clark Strawn, both of State Appellate Defender's Office, of Mt. Vernon, and Jamie L. Eastwood, law student, for appellant.

Darrell Williamson, State's Attorney, of Chester (Norbert J. Goetten, Stephen E. Norris, and Sharon Shanahan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KUEHN delivered the opinion of the court:

Michael A. Peterson has taken four brides. None of them have ever wanted to stay married to him for very long. In 1996, his second wife, Carol, simply could not rid herself of him without special help from the courts. When he ignored an order of protection that prohibited contact with Carol, repeatedly driving by her residence, Peterson was prosecuted and convicted of violating the protective order. He was fined and placed on conditional discharge.

This case involves a different wife but presents a similar story. Peterson's fourth wife, Dawn, procured an order of protection prohibiting him from having any contact with her. Once again, Peterson ignored the court's authority. This time his disregard for an order of protection landed him in prison.

The evidence at the trial established the following facts.

Spurred by physical and mental abuse from her husband, Dawn Peterson sought court-ordered protection under the Illinois Domestic Violence Act of 1986 (750 ILCS 60/101 *et seq.* (West 2000)). A circuit judge entered a protective order on June 5, 2001, which, among other things, prohibited Peterson from harassing or stalking his wife. Dawn was awarded temporary exclusive possession of the marital residence located on the outskirts of Walsh, Illinois, a little town that lies southwest of Sparta, Illinois. Peterson was told by the court that he was not to have *any contact* with his frightened spouse.

Peterson moved into the Sparta Motel. Its location provided ample physical separation to easily avoid future contact with Dawn. Sparta was more than 10 miles northeast of Walsh, and most of the larger southern Illinois communities that Peterson might have reason to visit lay north of Sparta. This was particularly true of Red Bud, Illinois. It could be easily reached by traveling northwest of Sparta on a state highway that went directly to Red Bud. That highway, Route 154, would take Peterson in the opposite direction from his court-protected spouse's residence.

According to Peterson, Red Bud provided the nearest access to Amoco gasoline, Peterson's fuel of choice. On June 9, 2001, just four days after the protective order issued, Peterson drove to Red Bud. The Conoco station a few blocks from the Sparta Motel would simply not do.

Peterson's decision to drive more than 20 miles to replenish the source of power for his 1996 Monte Carlo was rendered particularly suspicious by his course of travel. Instead of steering a course northwest to Red Bud on Route 154, he started out in the opposite direction, driving south on Route 4, another state highway. After driving several miles south, he turned due west on Schuline Road. Schuline Road is a county back road used to get from Sparta to Walsh or Evansville, Illinois. Several houses line the road, including the one that Peterson used to live in—the one still occupied by his court-protected wife. Peterson had to pass the house on his way to Red Bud to purchase Amoco gasoline. After passing the house, he had to traverse the towns of Walsh and Evansville. Ultimately his circuitous route of travel to Red Bud took him to another state highway, Route 3. He headed north on Route 3, and after driving several additional miles, he arrived in Red Bud and filled his gas tank. Upon his return home, he again spurned a shorter drive via Route 154 and traveled a path that took him by his erstwhile abode.

Two days prior to this Red Bud excursion, and only two days after the protective order issued, Peterson had the misfortune of deciding to

do some banking at the precise moment that Dawn, his court-protected spouse, was poised to exit her vehicle on the bank parking lot. According to Dawn, she sped off as Peterson approached her. Peterson was trying to have a word with her but was left standing on the lot talking to himself. On June 9, 2001, the same day that Peterson journeyed to Red Bud for gasoline, Dawn received a five-page letter in the mail. Its words echoed refrains that she had heard before. Peterson wrote, again promising to make amends.

According to Dawn, Peterson drove by her house at least six times on June 9, 2001. The fifth time that Dawn saw him drive by, he saw her. She was standing at the kitchen sink giving their five-month-old baby a bath when he saw her at the kitchen window. Peterson brought his car to an abrupt halt, got out, and assumed a position across Schuline Road that made him clearly visible to Dawn. He gestured to her, waving his hands about, to assure himself that he had her full attention. Then, he braced his stance, placed his hands on his hips, and glared at Dawn for well over a minute. When Dawn went to report his presence to the police, he left. However, he returned again after dark. Dawn saw him drive by at around 9:30 p.m.

Peterson was still cruising roads in the vicinity of the home at 11 p.m., when he was stopped by Shannon Wolff, a Randolph County deputy sheriff. Deputy Wolff had received the report from Dawn, and when he asked Peterson about the reported behavior, Peterson admitted driving by but not to seeing or having any contact with his court-protected spouse. He explained that he had to use Schuline Road earlier in the day in order to buy Amoco gasoline in Red Bud.

Peterson denied that he had repeatedly driven by Dawn's house. He also denied that he had gotten out of his car. He did admit that, by happenstance, he saw her at the bank a few days earlier, but he denied that he had made any approach to engage in conversation.

A Randolph County jury heard these facts and returned a guilty verdict on the charge of violating an order of protection. The judge sentenced Peterson to a three-year prison term. This appeal ensued.

The State's information alleged that Peterson's violation of the order consisted of harassment *and* stalking, and the jury was instructed that the State had to prove harassment *and* stalking beyond a reasonable doubt.

■ The somewhat unique nature of the charge calls for an initial observation. In most cases of this kind, when a violation might fit an act of stalking as that term is defined under the Criminal Code of 1961 (see 720 ILCS 5/12—7.3(a) (West 2000)), it will usually also constitute an act of harassment as that term is defined under the Illinois Domestic Violence Act of 1986 (see 750 ILCS 60/214(b)(1) (West

2000)). Proof of harassment is all that is required in order to establish the offense of violating an order of protection. 720 ILCS 5/12—30 (West 2000). The State need only prove that a defendant's conduct would cause emotional distress to a reasonable person and that it, in fact, caused the court-protected person such distress. Where the conduct in violation of a protective order fits harassment *and* stalking, the State does not have to assume the added burden that an allegation of stalking would entail. However, if it does, it should, as a matter of course, instruct the jury on the meaning of the term "stalking." Since the State must prove stalking as defined by the Criminal Code of 1961 in order to prove a protective-order violation on that basis, it will usually charge stalking as a separate offense, if the conduct in violation of a protective order rises to the level of stalking.

■ Here, the State did not inform the jury of what conduct in which Peterson must have been engaged under the Illinois Domestic Violence Act of 1986 in order to commit the offense of stalking. We are asked to overturn the conviction and order a new trial in light of the trial judge's denial of a defense request that the jury be instructed on how stalking is defined under the Criminal Code of 1961. While we agree that the tendered instruction, or one like it, should have been given, we do not believe that the shortcoming requires a reversal or a new trial.

The jury was properly instructed on what constitutes harassment. Because the jury was told that it had to find that Peterson engaged in harassment and stalking, in order to reach its verdict the jury must have found that the State proved harassment beyond a reasonable doubt. While the State charged Peterson with harassment and stalking and the trial judge instructed the jury that the State had to prove both, the law only requires conduct that constitutes harassment in order to establish the crime of violating a protective order. Hence, the State established the offense of violating an order of protection by proving to the jury's satisfaction that Peterson had harassed his spouse. The error in failing to properly instruct the jury about the stalking allegation proved harmless to the outcome reached.

Because the issue of defining the term "stalking" might arise in this context again, we examine the error in refusing the definition tendered.

Peterson's defense counsel submitted the following nonpattern jury instruction during the jury-instruction conference:

> "A person stalks another person when he knowingly, on at least two separate occasions, follows another person and/or places another person under surveillance and transmits a threat to inflict, or places that person in reasonable apprehension of receiving, im-

mediate or future bodily harm, sexual assault, confinement, or restraint."

The instruction tracks the definition of stalking found in section 12—7.3(a) of the Criminal Code of 1961 (720 ILCS 5/12—7.3(a) (West 2000)).

The State's Attorney objected to the tendered instruction. He argued that the instruction defined the criminal offense of stalking, something that was unnecessary and inappropriate where the charge was a violation of an order of protection. He felt that the term "stalking," used in the context of this case, was used in a general sense. In effect, the defense instruction would burden him with having to prove the criminal offense of stalking. The State's Attorney took the position that the legislatively defined crime of stalking was not at issue in terms of the stalking allegation contained in the information.

The trial judge agreed, stating: "[The tendered instruction] is not going to fit any type of general definition. So based on that alone, the Court's going to deny your Tendered Instruction Number 1."

The crime of violating a protective order is set forth in section 12—30 of the Criminal Code of 1961 (720 ILCS 5/12—30 (West 2000)), which reads, in pertinent part, "A person commits violation of an order of protection if *** [h]e or she commits an act which was prohibited by a court *** in violation of *** a remedy in a valid order of protection authorized under paragraph[ ] (1) *** of subsection (b) of Section 214 of the Illinois Domestic Violence Act of 1986[.]" 720 ILCS 5/12—30(a)(1)(i) (West 2000).

The Illinois Domestic Violence Act of 1986 provides for orders of protection, both in content and in remedy. The provision at issue in this case was section 214(b)(1), which prohibits, among other things, "harassment *** or *stalking* of the petitioner, *as defined in Section 12—7.3 of the Criminal Code of 1961.*" (Emphasis added.) 750 ILCS 60/214(b)(1) (West 2000).

Contrary to the reasoning employed by the trial judge in denying the instruction, the conduct implicated by an allegation of stalking in a charge leveled under section 12—30 of the Criminal Code of 1961 is not generic but rather is limited to conduct specifically defined in section 12—7.3 of the Criminal Code of 1961. Without an instruction that tracks the statutory definition, there is no way for a jury to properly measure an accused's conduct when the jury decides whether a protective-order violation based upon the act of stalking has occurred. In order to properly weigh evidence attempting to establish that a protective order has been violated by stalking the protected person, a jury needs to know that in order to stalk someone in violation of a protective order, a defendant must have followed or placed the

634

protected person under surveillance on at least two occasions and either transmitted a threat of, or placed that person in reasonable apprehension of receiving, immediate or future bodily harm, sexual assault, confinement, or restraint.

The facts of this case provide a good example of why the absence of an *instruction on what constitutes stalking under the Criminal Code of 1961* could taint a verdict. Had the State alleged only the act of stalking or had it alleged harassment *or* stalking, the jury may well have returned a guilty verdict upon an erroneous factual determination that Peterson had engaged in stalking when it actually believed that the stalking behavior had only occurred on one occasion. The jury could have easily believed that Peterson's behavior when he realized that Dawn saw him constituted stalking conduct, while the more benign, silent cruising past the home did not amount to stalking. Moreover, a common perception of stalking behavior could have been applied to all of Peterson's conduct with nary a thought about whether that conduct transmitted a threat of, or placed Dawn in reasonable apprehension of receiving, immediate or future bodily harm, sexual assault, confinement, or restraint.

Since section 214(b)(1) of the Illinois Domestic Violence Act of 1986 clearly calls for conduct defined under the Criminal Code of 1961 to form the basis of a stalking allegation made in a charge brought under section 12—30 of the Criminal Code of 1961, the content of that conduct needs to be explained to the jury in order to ensure accurate decision-making.

For the reasons stated, we affirm.

Affirmed.

HOPKINS, P.J., and MAAG, J., concur.